Judge Ewing
delivered the opinion of the Court.
On the 20th of July, 1820, Joseph Towles became bound in a replevin bond to Lewis F. Stephens, for a large sum of money; and Stephens and Towles both having died, the administrator of the former brought an action of covenant on the bond against Andrew Barnett, as the administrator of the latter.
Barnett, among other pleas, pleaded pleno administra-vit; upon which issue was taken, and a verdict found for Barnett on that issue.
A motion for a new trial having been moved and overruled, exceptions were taken to the opinion of the Court, and the whole evidence spread on the record, and the case brought to this Court for revision.
Various questions are raised in the record, by exceptions to the opinions of the Court, in excluding and ad *258 mitting testimony, before the jury, and in giving and refusing instructions applicable to the foregoing issue.
A mortgage that .was not acknowl edged and deposited for record in the proper office, within 60 days after its execution, is not valid against any creditor of the mortgagor.
Towles died possessed of several slaves, of which he had once been the unquestionable owner. After his death, Barnett, having administered on his estate, took possession of these slaves, claiming them as his own, under contracts of purchase from Towles, in his lifetime, and has held them ever since, in his individual character, and not as administrator. He took possession, at the same time, of other property of Towles, amounting to some three or four hundred dollars in value, which he sold as administrator, and claims to have fully administered.
The plaintiff contended, and introduced proof conducing to establish, that the contracts of purchase of the slaves set up by Barnett, were fraudulent and void, and being fraudulent and void, he had a right to hold Barnett responsible for them, in his fiduciary character, as assets.
Barnett contends that his contracts of purchase were not fraudulent; and if they were, he cannot be made responsible for them as assets, in a proceeding against him as administrator. And if such proceeding could be had against him, his absolute possession of them for ■more than five years before suit brought, claiming the absolute property therein, invests him with complete title, and bars any proceeding against him, for them or their value, as assets. And questions are made, by instructions, to the Court, given on the one side, and rejected on the other, involving those questions.
Three several claims to the property are exhibited and relied on by Barnett:—
First. On the 7th of September, 1821, Towles executed to him and others, a mortgage upon the slaves, to indemnify them, against some liabilities, as his sureties to the Commonwealth’s Bank. This deed was not proved or acknowledged, and deposited in the proper office for record, within sixty days, as is required by the statute of 1820, and consequently is legally invalid against “ any creditor.” It can, therefore, present no legal im *259 pediment to the plaintiff’s claim, whose intestate was a judgment creditor at and before its execution.
An ex’on was levied on a slave of value amply sufficient to pay the debt. Before the sale, B (a friend of the defendant) paid the debt; the ex’on was assigned to him, & the slave restored to the deft. Three days afterwards , the ex’on was again levied on the same slave and 5 others, at the instance of the defendant; who also gave written directions to the sheriff'to sell all the six together; and the sheriff af terwards gave B a certificate that he had become the purchaser of the six slaves— without specifying the sum bid for them, or any other particulars. The slaves were never taken out ofthe defendant’s possession- The ex’on was return ed satisfied : — Opinion , that this pretended sale was evidently collusive, intended to cover the property, and1 defraud or delay the creditors of the execution debtor, and therefore void as to them.-A sale made ostensibly under execution, but in fact eollusively, and for the purpose of screening the property from the defendant’s creditors, stands on the same footing as a mere private sale; and the bare fact, that the property is left in the possession of the debtor, after the sale, renders it ipso facto void. And even where the sale was actually coerced, the fact that the property was left in the possession of the execution debtor, will aid other circumstances tend; ing to show that the sale was collusive, and fraudulent as to creditors- And where a purchaser under execution afterwards buys the same property from the execution debtor, without reference to the purchase under execution, the conclusion that the execution sale was a mere pretence, is irresistible.
The second claim relied on, is a purchase under execution. The circumstances of this purchase, as now appearing in the record, are as foliows. — In December, 1823, an execution in favor of one Allen, for about one hundred and thirty dollars, was placed in the hands of the sheriff for collection, against Joseph and Henry Towles, which was levied on John — one of the slaves in contest; and afterwards, on the 21st of January, 1824, the sale was stopped by order of the plaintiff, and the slave restored to Towles, the execution, on the same day, being paid off by Barnett, and assigned to him, and was returned, in April following, satisfied. But on the 24th of January, 1824, Joseph Towles, by his written authority to the sheriff, authorized him to levy the execution on John, Darby, Nancy, Jinny, Lucy and Lewis —being all the slaves in question. And, on the 14th of February, Towles executed a written authority to the sheriff to sell all the slaves together; and, on the same day, the sheriff executed to Barnett, a certificate expressing that he had sold the slaves, under the execution, and he? Barnett, had become the purchaser, without stating the amount of his bid, or the price of the purchase. .No change of possession seems to have taken place, but the slaves remained in the uninterrupted possession of Towles.
The circumstances detailed bear upon their face intrinsic evidence of fraud. They need no comment.- — ■ The rational mind cannot doubt, that it was a mere shift and contrivance to cover the property, and hinder and delay creditors.
The sale of all the slaves together, (if a sale at public auction was in fact ever made,) to satisfy an execution *260 which had before been paid off by Barnett, when John, upon whom the levy was first made, must have been more than sufficient to satisfy the whole amount, con-necte¿[ -^th the continued possession and ostensible ownership by Towles, can be rationally ascribed to no other plausible motive than an intention to cover the property, and throw obstructions in the way of other creditors.
Several slaves wore conveyed, l>y a bill of sale “tswere mero private papers, which the parties might keep concealed, while the actual possession and ostensible ownership of the slaves remained with the vendor — the sale must be regarded as fraudulent and void as to creditors. purporting to he upon a valuable consideration, & were delivered, and of the actual payment there is some proof: but there was no change of posses sion: but the par ties agree in writing, that the ven dor, who was liv ing on a farm belonging to the purchaser, shall be his overseer, and carry on the farm with those same negroes, & some utensils fur nished by the pur chaser; for which the latter agrees to pay him !¡il00 for one year, 8f al low him the priv ilege of keeping tavern; this contract was renewed annually, as long as the vendor lived — the $ 100 receipted for, and a new re ceipt given annu ally, for the ne-groes, by the overseer. Held, that, as the agree
*260 If the execution was prostituted and used as an instrument to effectuate the sale, it cannot thereby be made to stand upon better or higher ground than a private sale; and if so, the bare act of leaving the slaves in the possession of Towles, would render the sale ipso facto fraudulent and void. The intervention and abuse of the process of the Court cannot change the aspect of the case. If the sale was in fact made by the private agreement or understanding of the parties, and not by the coercion of the law, it partakes of the character of a private sale, and is subject to those rules of Jaw in relation to the possession, which are applied to private sales.
But if the sale was made under the coercive power of the execution, the continued possession, without explanation, is some evidence of fraud — as has been determined by this Court; and when' connected with the other circumstances, apparent in this transaction, as now proved, can leave no reasonable ground to doubt, that the sale was pretended and fraudulent, and was abandoned by Barnett himself; as it appears that, at a subsequent period, when he made another contract of purchase, real or pretended, that no allusion is made to this sale, nor to the consideration paid for it, nor to his interest under it; but a distinct, absolute bill of sale is accepted by him, in which Towles, as the owner of the slaves, sells to Barnet, and passes to him the absolute title, as if no previous title had passed, for and in consideration of eight hundred dollars, to him in hand paid; and attempts to prove by a witness, that the whole consideration was then paid down.
Barnett’s third evidence of purchase, relied on, is the , ... - . . . , bul ot sale above referred to, which purports to have *261 been executed, on the 24th of December, 1824, for the consideration above mentioned. This bill of sale is absolute and unconditional: yet, no change of possession takes place under it. It is true, on the same day, an article of agreement is entered into, between Barnett and Towles, by which it is agreed that Barnett has employed Towles as an overseer, for one year, on the place on which one Compton formerly lived; (it being the place then occupied by Towles, which had been rented of Barnett;) and stipulated to pay him, as overseer, one hundred dollars, and to place under him the slaves purchased from him, and some ploughs and horses &c., and to permit Towles to keep a tavern on the place. A receipt for the one hundred dollars is endorsed on the article signed by Towles, and is tested by the same witnesses that tested the execution of the article.
To an action of covenant against an adm’r, he pleadedplene administravit. On the trial of an issue upon that plea, the pltf. shows that several slaves, which had belonged to the intestate, and were in his possession at the time of his death, had been taken possession of by the adm’r; but he denies that he received them as adm'r; alleges that they are his own pioperty, and shows three different purchases of them, made by himself, in the lifetime of the intestate: all of which, however, are fraudulent and void as to creditors. Held, that the slaves, so possessed by the administrator, must be deemed assets in his hands, subject to the payment of the pvesent demand, and to the satisfaction of the judgment and execution thereon.
This agreement was renewed from year to year, till Towles’ death, with the like stipulations as those contained in the foregoing article. And Towles, each year, executed receipts to Barnett, acknowledging the reception of the slaves &c. as Barnett’s overseer.
These instruments can avail nothing to satisfy the requirements of the law in relation to the possession. Notwithstanding their existence, and the pains and particularity observed, in their execution, they were private papers, which might be kept in the pockets of the par- . . ° r r r ties, unknown to creditors or purchasers. The actual, ostensible possession still remained with Towles, and the visible ownership; and continued to remain with him till his death. And the slaves remained upon the place, according to the proof in the record, until Barnett, after letters of administration were granted to him, took the possession of them, and set up claim in- his own right. This latter purchase, or pretended purchase, must, therefore, be regarded as fraudulent and void.
Second. Can they be reached as assets in his hands, *262 by a proceeding against him as administrator? We entertain no doubt that they can. The purchases being fraudulent, they are void; and being void, the property attempted to be conveyed, must be regarded as the property of the decedent, as to all creditors, and, as such, passed into the hands of Barnett, as his administrator, as a fund for the payment of debts. It being his fidu-cial duty to pay the debts, he is bound to apply those funds which are liable to their payment, to that object. And if he do not, but applies them to other purposes, he is guilty of a devastavit, and may be made responsible for their value. If he applies them to his own use, under a pretence of claim, which has no force or validity against the creditor, he is as much responsible as if he had applied them to other uses, not sanctioned by the law. His own void contract can furnish him with no excuse for failing to appropriate the funds in discharge of debts, to which by law they are made liable; nor can it shield him, as a fiduciary, from responsibility, for failing to apply the trust funds in his hands, to the legal objects of the trust.
This position is clearly sustained by the decisions of the English Courts, on their statutes of frauds, and is also sanctioned by the principle of the decision of this Court, in the case of Warren vs. Hall, 6 Dana, 451. Indeed, the latter case goes beyond the principle here settled, in relation to the responsibility of an heir, whose duties to the creditor would not seem so imperative as those of an administrator. In that case, the heir was made liable as heir, though the property sought to be subjected, came to his possession before the death of his ancestor.
In the case of Bethel vs. Stanhope, 1 Croke's Rep. 810, scire facias was sued out against the defendant, as executor of Francis Yaughn, upon a judgment against the testator; and, upon an issue on the plea of no assets, it was found that F. Yaughn was possessed of divers ■goods, and made a fraudulent gift thereof to his daughter, and died, and that the defendant intermeddled with the goods, and afterwards, the daughter took possession of them, and afterwards, the defendant took out letters *263 of administration. And the Court determined, “ that, when the defendant intermeddled with the intestate’s goods, although he were neither executor or administrator, and afterwards administration was granted to him, a creditor had his election, to charge him as executor, or administrator
The principle settled in this case, goes beyond the principle laid down in this opinion. The administrator was made responsible for goods which had not been in his possession after the grant of administration to him, and which, after his intermeddling, had been taken possession of by a third person, claiming as donee. Here the administrator is the intermeddler and donee, and obtained and retains the possession of the slaves.
Whether, therefore, he intermeddled before or after administration, he may, within the principle of this case, be made responsible as administrator.
And indeed, within the principle settled by this Court, in the case of Warren vs. Hall, supra, he might be made responsible, though he obtained the possession under a fraudulent purchase, before the death of his intestate. If an heir or executor de son tort, could be made responsible, in such a state of case, in a suit bought against either of them in the character of heir, or executor, we can perceive no good reason why an action may not be sustained against an administrator. The latter has taken on himself, by the authority of law, a fiduciary trust, and is bound, it would seem, by the duties of his station, to deal fairly with the funds, which is justly and legally subject to the payment of debts, whether those funds came to his possession before or after the death of his intestate. In the case of an heir, or executor de son tort, no such trust has been assumed, and the obligation to pay the debts out of such funds would not seem so imperative upon them. And we can perceive no principle of reason or propriety, that would require the creditor to proceed against an administrator, into whose hands estate has come, as an executor de son tort.
The principle of a proceeding against such an executor is, that he has, by intermeddling, made himself an executor, or trustee for the payment of debts, and may *264 be treated by th,e creditor as such. But thex’e can be no necessity for treating and proceeding against him in that character, when there is an authorized fiduciary, into whose hands all the funds that are • sought to be reached, have come; and which, if they could be made liable as assets in the hands of an executor de son tort, would be equally liable as assets in the hands of the administrator. Indeed, if there be any difference, it would seem that it would require a stronger case to make the executor de son tort liable, than the administrator; as he is to be made out a wrong-doer, by intermeddling without right, when he may have intermeddled or retained possession under a colorable claim of right, without having taken on himself any obligations to enquire into the outstanding debts, and see that they are paid out of the funds justly chargeable with their payment, as is the condition of the administrator.
If the statute of limitations would apply in such a case {supra) five years from the time when the slaves came to the possession of the adm’r, and the six months during which an adm’r is exempt from suit, in addition, would he requir’d, itseems, to confirm the right. But—
Where a man dies possessed of pro-admh- mkés po”S session of, but,instead of holding it as assets, sets "P i.14 ,!.6 in.h.in?' of limitations will never apply to confirm his claim. The property will always be subject to ex’on against the estate of the intestate, unless the adm’r has so disposed of it that it cannot be reached by ex’on ; and then, he will be liable for its value, as for a devastavit.
Upon the whole, therefore, we conclude that the proceeding against the administrator, to reach those slaves, was proper.
Third. We are equally clear, that the statute of limitation can afford no bar to the remedy sought, for several reasons.
1. Excluding the six months, within which an action cannot be brought against an administrator, it does not appear that five years had expired, after the grant of administration, before suit brought. And' it does not appear in the proof, that Barnett obtained the actual possession of the slaves before he obtained the administration.
2. But if he did, the slaves being assets in his hands, he could not by his own act deprive the creditor of their value as such.
Had he sold or disposed of them, and failed to apply their proceeds, as required bv law, he would have been , , . , i guilty oí a devastavit to the extent ot their value, and might be made responsible for the amount. So, if he, by setting up an adverse claim to them, m violation ot *265 his duty, and against the rights of creditors, could, by holding them for five years, appropriate them to himself, and bar the creditor of his right to apply the property specifically to the payment of his debt, he would, by such act, be guilty of a devastavit, to the extent of the full value of the property so misapplied. They were assets when they came to his hands, and he stands accountable for them, or their value. The issue to be tried, on his plea, is not whether he now has the property, specifically, of the decedent in his hands, but whether he has fully administered the assets which came to his hands. An application of them to his own use, whether by claiming adversely for five years, or otherwise, cannot be an administration of them, as required by the duties of his station.
The issue on a plea of plene ad ministravit, is, not whether the adm’r still has-property that was of the intestate in his possession, hut whether he has administered legally all that has come to his hands; an appro priation of assets to his own use, even under a claim of title in himself with five years possession, is not a legal administration proof of such appropriation and claim does not support the plea. And—
Qu. whether an adm’r can set up title in himself to property which apparently belonged to his intestate when he died, ag’st those interested in the estate— whether he can claim as an individual, against himself as administrator. Payment by an adm’r of a debt of inferior dignity , while there is any unsatisfied judgment in the c’ty where the ad ministration was granted, is a de-vastavit — and of all such judg’ts he must take notice; the want of it is no excuse.
Debts due the Bank of the Com monwealth are debts of superi- or dignity, in a course of administration — by the act incorporating the bank. And there is nothing in the constitution inhibiting the application of the rule to a re-plevin bond executed before the act passed, by a -debtor who was living when it passed.
*265 Indeed, it might well be questioned, while his fidu-cial character continued, whether, consistent with its duties, or the fidelity due to those for whom the trust was, confided, he could be permitted to claim adversely to their interests, and rely upon the statute to bar their rights. He has taken upon himself the character of trustee for their use and benefit, and if he claim to hold adversely, his adverse holding is by himself as an individual against himself as a fiduciary: which, if allowed, would seem to encourage infidelity to his cestui que trusts. But as it is not necessary, we will not express any distinct determination upon this latter point.
Other questions are raised by the instructions.— Among them, the Court instructs the jury, in substance, that Barnett was not guilty of a devastavit by paying debts of an inferior dignity, as notes and accounts, if he had no notice at the time, of the plaintiff’s judgment.
This position is untenable, as was determined by this Court in the case of Hutchcraft's Administrators vs. Tilford, 5 Dana, 353. The judgment having been rendered in a court of the county in which administration was granted, and the replevin bond, which partakes of the dignity of a judgment, remaining of record in the county, the administrator was bound to take notice of it.
But in relation to the notes of the intestate, ovfring, at his death, to the Bank of the Commonwealth, they, by *266 the statute, were made debts of superior dignity, and it was the duty of the administrator to pay them first. Stat. Law, 220. And, though this statute was enacted after the replevin bond sued on was executed, we do not regard it as impairing the obligation of the contract. It was passed before the death of the intestate, and at the time of its enactment, the judgment creditor had no specific lien on the debtor’s property of higher obligation than other creditors, by note or simple contract, had or might have acquired. And no preference was then due to him over the claims of other creditors then existing, or which might be afterwards created. And they might, without infringing any of his rights, have reduced their simple contracts to judgment, and coerced their collection first. And the Legislature might, at any time in the lifetime of the obligor or judgment debtor, raise notes or accounts to the dignity of judgments, or even place them above them, in the course of administration, as we conceive, without the infraction of any known legal obligation secured by the constitution to the judgment creditor. It would certainly be competent for the Legislature, before the death of the debtor, to place all debts upon an equality in the course of administration. And if so, we can perceive no good reason why they might not, in the life of the debtor, give a superior dignity or preference to debts, in the course of administration, after his death.
In a contest, ■whether certain ■slaves were the property of an individual, or assets in his hands as an adm’r — a witness was offer ed, to whom the intestate , when insolvent , had given a slave: as a verdict against the adm’r (that the slaves .in con test were assets) might prevent the slave of the witness from being subjected to the debts of the
Brown and Fitzpatrick were offered as witnesses by the plaintiff, and excluded by the Court, as incompetent on the score of interest.
They were sons-in-law of the intestate who had given to the former a slave, after his indebtedness to the plaintiff’s intestate accrued, and to the latter, two slaves, long before his death. The estate is proven to be notoriously insolvent, except as to the slaves in contest.
The sale of the slave by Towles, though fraudulent, is good against them, and they can have no interest in them. But as the slave, given to Brown after the debt was contracted, may be made responsible to the payment of the debt, if it shall not be made out of the property in contest, he was interested in creating a fund *267 for its payment, and was, therefore, incompetent, unless he had been released by the plaintiff.
donor, the witness was interested, and, without a release, incompetent. A similar gift,when given not appearing, and so not shown that it was when the donor was insolvent , does not render the donee incompetent.
New trial for misdirection: no costs.
As it was not shown when the slaves were given to Fitzpatrick, and as they may have been given long before Towles’ death, and before the creation of the debt, and under circumstances which would exempt them from responsibility, a case has not been made out showing his interest. It was, therefore, improper, to reject his testimony.
Other points are made in the record of minor import, which may not arise on a second trial; we, therefore, deem it unnecessary to notice them.
As the opinions expressed by the Court, in giving and refusing instructions, are in conflict with this opinion, the judgment is reversed, and cause remanded, that a new trial may be granted, without the payment of costs. And the appellant is entitled to his costs in this Court.