Spring Term
1839.

CHANCERY.    McLaughlin's Administrators *against* Daniel.

[Messrs. Morehead & Brown for plaintiffs: Messrs. Robinson & Johnson for defendant.]

FROM THE CIRCUIT COURT FOR SCOTT COUNTY.

*June* 10.    Judge EWING delivered the Opinion of the Court.

Statement of the case.

WILLIAM CLARK obtained judgment against John Mc-Laughlin's administrators, for a demand due to their intestate, at the July Court, 1821, for two hundred and twenty one dollars fifteen cents damages, and eleven dollars forty seven cents costs. His execution was levied on a negro boy, by the name of Jack, as assets in the hands of the administrators—he being found in the possession of Mrs. McLaughlin, who was one of them; and upon a sale under the levy, Enos Daniel became the purchaser, and sold the boy to *Keningham.*

Mary McLaughlin, one of the children of John, set up claim to the slave, and commenced an action of detinue against Keningham, and recovered him.

Enos Daniel, claiming to have satisfied the judgment, commenced this suit, in chancery, to recover the amount of Clark's judgment, and enforce its collection out of some slaves in the possession of the widow, and former administratrix of Clark: she and her co-administrator having been previously removed, on the motion of their securities, and the sheriff ordered to take possession of the estate; and to which slaves, she and her children set up claim in their own right, under her father, Charles Daniel; also, to enjoin a bond for the balance of the price, which had been executed by him to Taylor, the sheriff, to whom the estate was committed upon the removal of the administrators.

The defendants answer—resisting the recovery, upon the ground, first, of a defect of parties; second, that the complainant was fully apprised, at the time of his purchase of Jack, that he was the property of Mary

McLaughlin; third, that the slaves sought to be subjected, were the property of the widow and children, and were never the estate of the decedent.

And the widow and her former co-administrator, besides the foregoing grounds, allege that they have settled with the County Court, and made distribution more than five years before the commencement of this suit; and plead and rely upon the statute of limitation of 1819—*Statute Law*, 1147. Also, that the widow has been in the adverse possession of the slaves sought to be subjected, claiming them in her own right, and as natural guardian to her children, for more than five years, and cannot now be disturbed by a creditor.

The Circuit Court decreed that the slaves were subject to the debts of the creditors of the deceased; and that the complainant should be substituted in the place of Clark, whose debt he paid, amounting to two hundred and thirty two dollars sixty two and a half cents; and that the slaves, or so many of them as were necessary, should be subjected to sale for the payment of the same and costs; and perpetuated the injunction against the bond to the sheriff for the residue of the price of the slave Jack. And the defendants have appealed to this Court; and assign various errors, questioning the decree, some of which only, we deem necessary to notice.

The defendant's counsel has also, filed cross errors, questioning the decree upon the ground that no interest was given.

We perceive no material defects of parties.

And admitting that Enos Daniel knew that Jack belonged to Mary McLaughlin, and was not subject to the execution against the estate, this, in our judgment, presents no legal impediment to his claim upon the estate, for the amount of Clark's demand paid by him. The slave was sold as the property of the estate, under the

creditor, and to have the amount of his purchase money refunded to him by the deft. in the ex'on, or—where the execution was against adm'rs—out of the assets of the intestate. And his rights, in this respect, are not affected by his knowing, at the time of his purchase, that the property sold, belonged to a stranger, and was not subject to the execution.

If a sale bond was given by the purchaser in such a case, its satisfaction may be presumed from lapse of time.

Where the property was recovered from a vendee of the purchaser under ex'on, it is not necessary for the latter to show, in his suit for indemnity, that he has reimbursed his vendee, to whom he only, and not the deft. in the execution, is liable.

process of law; he purchased him, and, by his purchase, and execution of a sale bond to Clark, he satisfied and extinguished that amount against the estate, and for which it stood responsible. And, according to the principle repeatedly recognized by this Court, he has an equitable right, to be substituted in the place of the creditor, and to have the amount so paid refunded to him out of the estate. His equity rests, not upon the ground of his want of knowledge as to the title of the slave, but on the ground of his having discharged a judgment against the estate, for which it stood chargeable, by a purchase of property, made under the coercive process of the law, and therefore, has the equitable right, to be reimbursed out of the estate. And if it could be deemed to be important for him to show, that he had actually paid off the sale bond, the lapse of time since its execution, would authorize a presumption of its payment, especially in the absence of any distinct denial of the fact by any of the defendants, and especially as the record before us, is certified to be only a part of the record, the residue having been destroyed in the burning of the office of the Court, where the case was tried. Nor do we deem it important for him to show by proof, that he has refunded the consideration to his vendee, Keningham, or satisfied him. He attended upon and defended the suit brought against him for the slave, and is bound by the recovery. And if he has not satisfied him, he stands *personally* liable to him; and Keningham has no remedy against the estate, as he would have, upon a sale of real estate and warranty of title. The complainant's right to be reimbursed is complete upon a judgment and eviction by paramount title against himself, or his vendee. And if the proof of payment to Keningham were deemed necessary, it would be presumed for the same reasons given as to the payment to Clark.

Defects in the allegations of a bill may be supplied by concessions in the answer.

Nor can we admit that the allegations of the bill do not sufficiently charge a recovery of Jack by paramount title. And if they could be deemed insufficient, any defect in this respect is supplied by the answers; all of which concede the fact, that Jack belonged to Mary McLaughlin, and she sued and recovered him from Ken-

ingham. And if this admission be regarded as made only in the answers of the administrators, it is sufficient for the purposes of the complainant's recovery, as will appear hereafter.

The statute of limitation of 1819 will not bar the complainant's equity; nor can the possession of the widow, for more than five years, be relied on, to protect her, or the estate in her hands, from responsibility, if it is otherwise subject to the payment of the testator's debts.

This suit is not founded upon, nor is it " on account of a contract of the intestate;" nor did the *cause of action* arise more than five years *before* the commencement of this suit, from any thing appearing in this record. But it is founded on an equity, springing in the complainant's favor, as has already been said, from the purchase of a slave sold as the property of the estate; the payment of the debt against the estate, and the *judgment in eviction* for the slave in favor of a better claimant. And his *cause of action* or *equity* accrued upon the *eviction*. The statute was intended to hasten creditors holding demands founded on *contracts with the testator or intestate*, to sue within five•years; but was not intended to apply to contracts or causes of action or equities arising after their death; nor will its language apply to such cases; nor was it intended; nor can it be made, by its language to apply even to contracts with the testator or intestate, which had fallen due, or upon which the cause of action had arisen, within less than five years before action brought, though a settlement and distribution had been made more than five years before. And much less can it be applied to causes of action originating after their death, and accruing within less than five years before action brought.

Besides: though a settlement has been made more than five years before this action was brought, the slaves may have made distribution and settled his accounts: still less, where the action accrued after the decedent's death, and the suit was instituted within five years of its accrual.

Nor can the limitation be applied where the object of the suit is to reach slaves, which (being claimed by the adm'r,) have not been distributed, nor included in any settlement. And—

The statute provides expressly for an action against the distributees who have received the estate, and must be understood as authorizing it against *the administrator* (or any other) in whose hands the property may be.

---

Spring Term **1839.**

McLaughlin's Adm'rs
vs
Daniel.

Where property is sold under execution against adm'rs, as assets, and the purchaser afterwards loses it by paramount title, his cause of action, to have his purchase money refunded out of the estate of the decedent, accrues at the time of eviction, not before. And—

Tho' by the act of 1819 (S. L. 1147,) an ex'or or adm'r is exempt from suit on account of any contract made with the decedent, unless the suit is commenced within five years, from the time he qualified, or from the time the cause of action accrued, provided he has distributed the estate, and settled his accounts—the act does not apply to contracts, or causes of action, or equities, arising after the death of a testator or intestate. Nor does it bar a suit on a contract made with the decedent, when the cause of action had not accrued till within five years of the suit, altho' the ex'or or administrator

sought to be subjected, were not settled for, nor have they been *distributed*, but still remain in the hands of the widow, the former administratrix. And though, as between the administrators and the distributees, they may not be distributable as the estate of the intestate—yet, if they are responsible for debts, and remain in the hands of the administratrix, they may be reached specifically by the creditors, though the time had expired for prosecuting a suit against the administrators. In the latter clause of the statute, it is provided, " But in such case," meaning in case of distribution, " an action may be maintained against the distributees who have *received the estate.*" By any fair interpretation of this clause, the *estate* which is liable may be reached, as well in the hands of the administratrix, as in the hands of the distributees. At least, it cannot be inferred that the proceeding against the *estate*, was intended to be inhibited. The statute was intended to secure administrators from personal responsibility after five years, in case distribution was ·made, but not to secure the *property* which remained in their hands from liability, any more than the same would ·be secured from liability in the hands of distributes or others.

In relation to the adverse possession of the slaves, set up by the widow, it cannot avail her. The possession ·of slaves for five years, if admitted to be a good bar ·against creditors, cannot operate as a bar against them, ·or any other whose *title* or *cause* of action had not accrued more than five years before suit brought. And we have already said that the complainant's *cause of action* accrued, upon his vendee's eviction, which does not appear to have been more than five years before this suit was commenced.

An adm'r cannot escape from accountability for the slaves which have been assets in his hands, by having held and claimed them as his own, for five years; for a failure to apply them to the payment of the debts, he

Besides: the slaves in question were in the possession and under the control of the widow, while she acted as administratix, and before her removal. They were then assets in her hands, and she was guilty of a devastavit in failing to apply them to the payment of debts. And can no more escape from responsibility by setting up claim to them in her own and her children's right, and holding them adversely for five years, than she could

escape from it by having sold and converted the proper-
ty to her own use, or applied them improperly in the
course of administration.   They were assets when they
were in her hands as administratrix, and she is respon-
sible for their value as assets, upon her official bond:
against a suit upon which. time had not run; and the
property still remaining in her hands, may be subjected.
*Stephens' Administrator vs. Barnett, Administrator of Towles,*
7 *Dana,* 257.

But it is contended that the slaves never belonged to
John McLaughlin, but were given to his children, after
his death, and to the widow, to hold and enjoy until the
youngest child came of age, by her father, Charles
Daniel, and a deed of gift to that effect is exhibited.

It is proven, that the widow is the daughter of Charles
Daniel, that John McLaughlin married her, in 1803.
That shortly after the marriage, *Nelly,* the mother of
the three slaves in contest, was put into the possession
of the married couple, and most probably upon a loan,
and that she and her children remained quietly in their
possession, used and enjoyed by them, with every visible
act of ownership over them, until the death of John
McLaughlin; which took place in 1819.   No deed evi-
dencing the loan was made and recorded.   But it is
proven, by Charles Daniel, junior, that "the girl was
frequently at his father's house, divers times in each
year, for days and weeks before the death of John Mc-
Laughlin."   "He does not recollect whether he heard
his father say that she was there for the purpose of re-
taining his right to the property, but he heard it spoken
of in the family in that way."   And by George Mc-
Laughlin, a brother, "that during his intimacy in his
brother's family, which was for a few years after the
marriage, Nelly went to her old master's regularly for a
number of years, he thinks every year; and when Nelly
had two children, he recollects, she had them at Charles
Daniel's, to be under the superintendence of Mrs. Daniel,
who was a midwife."   He, also, gives evidence tending
to prove, by the acknowledgments and acts of the par-
ties, that the girl Nelly was not given, but loaned, to
McLaughlin.

Spring Term
1839.

*McLaughlin's
Adm'rs*
vs.
*Daniel.*

will be answera-
ble upon his
bond.

Review of the ev
idence adduced
—on the one side,
to show that the
slaves in contest,
were a loan to
the wife of the
intestate (by her
father,) and nev-
er assets in her
hands as her hus-
band's adm'x; &,
on the other, that
they were a gift
to her and so li-
able for his debts;
and the question
of loan or gift be-
ing left doubtful
—it is *held that,*
if the slaves were
only lent, as there
was no *recorded*
memorial of the
loan, and they
remained in the
general posses-
sion of the dece-
dent for more
than five years—
the fact that they
frequently return
ed to their old
master, the len-
der's, and made
long visits at his
house, does not
evince such a
cessation of the
bailee's posses-
sion as to take
the case out of
the *statute of
frauds*: they are,
therefore liable
for the deced-
ent's debts.

On the other side it is proven by a disinterested neighbor, John Ducker, who lived near John McLaughlin, after his removal to his neighborhood, in Campbell county, from Pendleton county, where the last witness was intimate in the family of his brother, which was some two or three years after the marriage, that he was well acquainted with the parties, and with Nelly; that she was in the possession of McLaughlin and wife, for many years, say seven or eight, claimed as their property, and every act of ownership exercised over her and her children. That he knows nothing of their returning to Charles Daniel's, or of his having possession of them, or claiming any ownership, or exercising any control over them, until John McLaughlin pawned them to one Kirby, in 1815; after which, Charles Daniel set up some claim to them, and they went upon a visit to his house, and he retained them for a short time, and until McLaughlin settled with Kirby, when he sent them back to McLaughlin, and he retained them until his death.

Admitting that Nelly was loaned, and not given, which is certainly very questionable from the whole proof, the question occurs whether the possession has *remained* with McLaughlin for five years, so as to subject the slaves to creditors, under the statute of frauds—*Stat. Law*, 739; or whether the possession has been so broken, by the occasional returns proved, as to protect the slaves from the claims of creditors under the operation of the statute. We think, within any legitimate or beneficial and operative interpretation of the statute, that the occasional returns proven, will not suffice to exempt them from the claims of creditors. The returns seem to have been known only to the members of the family and to have been such only as may have taken place consistent with the absolute right of property in McLaughlin. They may have been such visits as family servants are usually permitted to pay to their old masters, and even such as would not apprise the neighborhood of any distinct or ostensible claim of the property in Charles Daniel.

We cannot recognise the returns as proved such an interception of the general possession of McLaughlin,

as to protect the slaves from the claims of creditors, if even it could be conceded, that the possession of McLaughlin was interrupted at all, during the seven or eight years that he lived in Campbell county, spoken of by Ducker. If such returns could be regarded as sufficient, all the mischiefs intended to be guarded against, must follow, and the statute which was intended to afford protection to purchasers and creditors, be rendered a dead letter. For there are few cases in which the same general proof might not be made of occasional visits of servants held by members of the family on secret loan, unknown to any but the family. If upon debts being contracted, and thickening around them, the secret loan could be made appear, and the property rescued from the provision of the statute, by such proof of occasional visits or returns, the principal case intended to be provided against by the statute, will have escaped its provisions. We cannot sanction such a construction. To take the case out of the statute, the reclamation on the part of the owner, should be open and public, under a claim and exercise of dominion and control over the property, adverse to and inconsistent with, the possession of the loanee, and such as amounts to a divestiture of it from the time. *Ewing's Heirs vs. Handley's Executors,* 4 *Littell's Rep.* 358-9. And similar to the view here expressed has been the decision of the Court of Appeals of Virginia, upon their statute—which is verbatim with ours—in the case of *Boyd, Swepson and others vs. Stainbach, and others,* 5 *Munford's Rep.* 305. And it has been settled by that Court, that five years possession under a loan, vests a title in the loanee, which inures to creditors, which cannot be divested as to them, by a return of the slaves after the expiration of the five years. 5 *Munford,* 101.

Upon the whole, we think the slaves are subject to the complainant's demand.

As to the cross errors, as it does not appear that the complainant has accounted for the hire of Jack, when he had the possession of him, which hire could not have been recovered by another claimant—the purchaser got a decree for his money, but complains that interest was not allowed him: but, as he was not charged with hire—and some facts may have disappeared with part of the record that was destroyed, this ct. declines changing the decree.

*In a suit for indemnity for the loss of a slave purchased under ex'on, and recovered by another claimant—the purchaser got a decree for his money, but complains that interest was not allowed him: but, as he was not charged with hire—and some facts may have disappeared with part of the record that was destroyed, this ct. declines changing the decree.*

Spring Term 1839.

*Hart &c.*
vs
*Flynn's Ex'or.*

been recovered in the suit against Keningham, and as other facts may have been shown to justify the Chancellor below in withholding interest, in the exercise of a sound discretion, which are not exhibited to this Court, by reason of a diminution of the record from the burning above alluded to, we do not feel warranted in disturbing the decree with respect to the interest.

Decree affirmed.