## Commonwealth, for Halley's Adm'r. *vs* Richardson *et al.*

DEBT.

ERROR TO THE MADISON CIRCUIT.

Case 23.

*Executors and Administrators. Pleading. Frauds.
Trusts. Limitation.*

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

December 18.

THIS action was brought against Richardson and his
sureties, upon his bond as administrator of Lawrence
Thompson, dec'd., to recover for an alledged *devastavit*.
The declaration states the bond and condition, and also

Case stated.

a judgment of September, 1846, in favor of the relator against the administrator, for $1,097 28, with interest from its date, and a writ of *fieri facias* thereon returned "*nulla bona ;*" and avers that before the judgment was rendered, the administrator had received assets more than enough to pay it, but had wasted and converted them, &c.

The pleadings.

The defendants pleaded four pleas in substance as follows: 1st. That the administrator had fully administered all the goods, &c., at the time of the judgment, and had none afterwards. 2d. That he had fully administered, &c., before notice of the relator's demand, and had no assets afterwards. 3d. That he had kept and performed all the covenants to be by him performed, &c., according to the tenor of said writing obligatory. And 4th. That the judgment, &c., was upon a cause of action which accrued against Richardson's intestate, L. Thompson, and that more than five years had elapsed from the time of Richardson's qualifying as administrator before the commencement of the action in which said judgment was obtained; and that before its commencement, he had distributed the estate according to law, and settled his accounts with the Court. To each of these pleas the plaintiff replied by way of traverse. And a general verdict having been found for the defendants, the plaintiff prosecutes a writ of error for the reversal of the judgment thereon. Of the numerous questions made in the progress of the trial, and by the assignment of errors, we shall first notice those which relate to the pleadings, and may be considered without a particular reference to the facts.

The act of 1811, (*Stat. Law*, 672,) allows the defendant when sued for a *devastavit* under the plea of *plene administravit*, to show the real amount of assets in his hands unadministered at the date of the judgment, and limits the recov-

I. It was moved in the Circuit Court, and is now contended, that as none of the pleas deny the averment that the administrator had received assets more than sufficient to satisfy the judgment, this averment is to be taken as true, and that consequently the defendants could not be entitled to a verdict, unless they showed that the administrator had administered an amount of assets at least equal to the judgment. But the averment in question, so far as it refers to the amount of assets, is a formal one. And such averments are not conclu-

sively admitted to their full extent by the failure to deny them expressly. And if it were otherwise in ordinary cases, the act of 1811, (*Stat. Law*, 672,) expressly authorizes the executor to plead *plene administravit* in the action brought against him for a *devastavit*, and to show, under that plea, the real amount of assets in his hands unadministered at the date of the first judgment; and limits the recovery to that amount. The executor is thus relieved from the effect of any admission which might be implied from a comparison of the plea of *plene administravit* with the averments of the declaration in the action for a *devastavit*, as by the same statute he is relieved from the effect of the admission of assets previously implied from a failure to plead in the first action. This motion was therefore properly overruled.

II. The plaintiff also moved the Court to instruct the jury to disregard each of the four issues as immaterial. Whether if the issues were in fact immaterial, this motion should have been allowed before verdict, and without directing a re-pleader, we shall not stop to enquire. But as the issues were taken upon a traverse of each plea, and cannot therefore be immaterial, if the pleas are substantially good, we shall consider the sufficiency of the pleas. The act of 1811, already referred to, expressly exempts executors and administrators from liability for more than the amount of assets which have come to their hands on account of a failure to plead, or on account of any plea by them pleaded, and to secure this exemption, gives the privilege of pleading and proof, and limits the recovery in the subsequent action as above stated. Under this statute, the plea of *plene administravit*, although general in its terms, is made to refer to the time of rendering the first judgment. And any plea which shows that at that time the executor had fully administered, and had no assets in his hands unadministered, is authorized by the statute, and gives the privilege of proving the amount of assets at that time, or that there were none, with the effect of repelling a recovery, or limiting its extent according to the proof upon this point. The two first pleas are in form as well as in substance, pleas of *plene administravit*, the one

COMMONWEALTH.
*vs*
RICHARDSON
*et al.*

ery to, that amount.
—The same statute authorizes the filing of any plea which show that at the time of the first judgment the executor has fully administered.

COMMONWEALTH
*vs*
RICHARDSON
*et al.*

It is no objection after verdict, that a plea to an action of debt on an executor's bond, alledged that the defendant had performed the conditions of his executorial bond, it is in substance, *plene adminis-travit.*

more special than the other, but each showing, if true, a full administration, which implies a due administration of all the assets at the time of the rendition of the first judgment.

And although the third plea, as being inappropriate in an action of debt and not sufficiently direct and specific, might have been held bad on demurrer, yet as it is a substantial answer to the alledged breach of the condition, we could not regard the issue formed upon it as being immaterial. And as a performance of the conditions of the bond for securing the duties of the administrator, necessarily implies a full and due administration of the assets, which could not be if the administrator left a judgment unpaid when he had assets which should have been appropriated to its payment, we think this plea should be regarded as in substance, a plea of *plene administravit.* But as it was not made the ground of admitting any defence which was inadmissible under the two first pleas, it was really unimportant what disposition was made of it on the trial.

The principal objection to these pleas seems to be founded upon the act of 1839, "to regulate the administration and settlement of estates," (3 *Stat. Law,* 240.) But that act, although it changes materially the course of administration, and therefore, affects the question of what is a due administration of the assets, and how it is to be proved, does not repeal any part of the act of 1811. The act of 1839 relates to the mode of administration and settlement, makes all debts of equal dignity, and in case of deficiency of assets, requires all to be paid *pro rata,* in proportion to their amounts. It provides a mode of proceeding with the administration and settlement under the supervision of a Court of equity, whose principles it adopts and carries out. But it makes no provision as to any proceeding at law against the executor, except to authorize the Chancellor, when the estate is brought before him for administration, to enjoin the action of any creditor against the executor as tending to disturb the equitable proceeding. This statute rather diminishes than increases the burthen and responsibility of the executor, and certainly deprives him

of no privilege of pleading or defence in the action at law. But as it prescribes a new rule of duty in the administration, the plea to the action at law will be bad if it show a violation of that rule. It is not necessary, however, to show specially in the plea, a conformity to that rule, any more than it was before necessary to plead specially a due administration. The executor is still liable only for the amount of assets not duly administered at the rendition of the first judgment. He may plead any plea which shows that he had then fully administered, or he may show specially by plea, how he had fully administered, provided his plea be not too prolix, or he may show by special plea or by proof under the general plea, how far he had fully administered, and what amount of assets remained unadministered.

The objection that the first and second pleas admitting the non-payment of the debt now in question, show a violation of the act of 1839, requiring a rateable payment of all debts, is not tenable. The rule of equality and rateable payment under this statute, is no more imperative than was the pre-existing rule of inequality and preference according to dignity. As the former rule required payment according to dignity, so far only as the executor had notice of demands against the estate, and admitted of a due and full administration, though debts of inferior degree may have exhausted the assets, leaving nothing to satisfy superior debts afterwards disclosed, so does the rule of equality and rateable payment apply only to known debts, and admit of a due and full administration without payment of such as are, in good faith, unknown, until the assets are exhausted. The act of 1839, in authorizing the executor to go into the Court of equity with the estate, affords him the means of concluding all unknown creditors who do not come forward with their demands, but it affords no means of compelling them to do so. And as it authorizes the executor to file his bill only in case he is satisfied that the personal estate is insufficient, which he must state in the bill. And as his opinion or judgment can only be founded upon his knowledge or rational belief, it seems clear that he is not expected nor bound by the statute to act

COMMONWEALTH
vs
RICHARDSON
et al.

An executor is not bound to file his bill under the statute of 1839, for distributing estates; unless he believe that the personal estate will not pay the debts, he cannot, therefore, be made responsible for failing to file such bill, and compelled to pay debts of which he had no notice before he had fully administered.

in reference to debts of which he has no knowledge and no rational ground to apprehend the existance. The second plea, therefore, meets the present objection expressly by its averment of full administration before notice of the present demand. And the first and third meet it by necessary implication in averring a due admanistration, and a performance of the conditions of the bond. The plaintiff might, perhaps, have shown a violation of the act by his replication, but it was fully involved in the issues on the pleas.

The fourth plea is founded on the fifth section of the act of 1819, (2 *Stat. Law*, 1147,) entitled, "an act authorizing suits against heirs and devisees in certain cases, and limiting the time of bringing suits against executors and administrators." The fifth section enacts, "that no suit shall be brought against an executor or administrator on account of any contract of the testator or intestate, unless brought within five years from the time of his qualifying as such, or within five years next after the cause of action accrued: Provided, such executor or administrator has, before suit brought, distributed the estate according to law, and settled his accounts with the Court. But in such cases, an action may be maintained against the distributees who have received the estate." &c. The plea makes out the case provided for by this section. But the question is, whether as it was not pleaded in bar of the first action, it can be available in the second, which is founded on the first. And this depends upon the question whether, so far as regards executors and administrators, this fifth section is to be considered as a mere statute of limitations, or whether it is to be understood as having the further effect of furnishing a rule or test of due administration. If it should have this latter operation, then as under the principle of the act of 1811, the executor does not lose the benefit of a due administration, by having failed to plead to the first action, but may plead and show it to repel the charge of a *devastavit* in the second; we think the plea showing a due administration according to this act of 1819, should be deemed a good bar to the action for a *devastavit*. And in reference to this plea as to the

others, we say that the act of 1839, though in changing the course of administration as between creditors, it affects the question as to what is a due administration, and therefore, affects the evidence by which it is to be proved or disproved, does not deprive the executor or administrator of any benefit arising from a due administration of the assets, nor of the right of pleading the fact as previously authorized. The act, as already intimated, makes no provision in aid of the creditor's legal remedy. It certainly does not intend to favor his laches in the prosecution of that remedy; and we are satisfied that it does not do away the prohibition contained in this act of 1819, and that it does not affect the defence afforded by that act, except so far as the new rule of administration may change the evidence by which the averment of distribution according to law may be sustained in proof. Does the act of 1819, then furnish a rule or test of due administration, of which the executor may avail himself as a protection in the action for a *devastavit?* Upon consideration of its objects and policy as developed in its title and general provisions, and especially in this fifth section, we are of opinion that it does—that in the case for which the fifth section provides, that is where the creditor has not sued within five years, and the executor has, before suit brought, distributed the estate according to law and settled his accounts, the fifth section not only makes such distribution and settlement as against such procrastinating creditor, a bar to the first suit, and in that way a bar to the suit for a *devastavit*, to which a judgment in the first action is essential, but that in prohibiting any suit against the executor, and giving the creditor a remedy against the distributees, founded on the distribution and settlement, it intends to make and does make such distribution and settlement, as against that creditor, a due and legal administration of the assets, of which the executor may avail himself against the charge of undue and illegal administration in the action for fixing a *devastavit* upon him.

But as the distribution according to law implies, in the statute, the payment of all known debts, before the disbursement of the assets to the distributees, so the aver-

COMMONWEALTH
*vs*
RICHARDSON
*et al.*

—But it is still necessary for him to show a legal distribution as well before as

COMMONWEALTH
*vs*
RICHARDSON
*et al.*
───────────
since the act of
1839.

ment of such distribution in the plea, implies the same fact, which is therefore put in issue by a traverse of the plea. Ever since the act of 1839, the executor may undoubtedly proceed, after the payment of all known debts, to disburse the assets to the distributees. And if this be completed before notice of a particular demand, and the creditor holding that demand fail to sue within five years, we do not perceive that either the plea or the defence to be made under it, is affected by the act of 1839. Nor do we perceive that this act has changed the duties or rights of the executor, who after paying all known debts, has made partial distribution before a new demand is presented or discovered. It was always his duty, as much as now, to appropriate the remaining assets to the payment of the first demand. Before the act of 1839, the creditor might, by suing at any time before his demand was barred by the general acts of limitation, make the executor liable to the extent of all the assets distributed, though he had received such as were undistributed when he presented his demand. But if he delayed his suit for five years after accrual of his action, and qualification of the executor, and the executor had paid to him all the assets which remained undisbursed for debts, and in distribution when his claim was discovered, and settled his accounts with the Court, these facts would, as we apprehend, have fully sustained the bar, under the act of 1819, and operating as against that creditor as a full and due administration of the assets, would have completely exonerated the executor, and turned the creditor exclusively upon his remedy against the distributees. But whether this be so or not, and whether if it be so, the facts supposed would have the same operation since, as before the act of 1839, it is not absolutely necessary to decide in the present case. It may be, that in the case supposed, it is no more the duty of the executor under that act, to pay the newly discovered debt to the extent of the assets distributed, than it was before and after the act of 1819 was passed; and the act of 1839 does not save the creditor who sleeps upon his claim for five years, and then resorts to his remedy at law, from any of the

consequences which the act of 1819 imposes upon him for his laches. But be this as it may, this fourth plea, as well as the others, was properly held to be sufficient, and there was no error in overruling this motion.

III. But we are satisfied that nothing short of a full disposition of all the assets, by payment of known debts, (or a tender, which if refused should have the same effect,) and a distribution of the residue, or a distribution of the whole estate if there be no known debts, and in either case a settlement with the Court, which will show where the assets are to be reached, will operate to sustain the bar under the act of 1819, as a defence either of the first action, or of the subsequent one for a *devastavit*. The statute did not intend to split up the remedy of the creditor, but intended to turn him from the executor to the distributees for the assets, only when the former had laid a just foundation for his own exoneration by a complete distribution, and had, by a settlement of his accounts, furnished to the creditor the appointed means of knowing to whom he is to resort for the appropriation of the assets to his demand. The opinions of the Court, in giving and refusing several of the instructions asked for upon the trial, having been based upon a construction of the 5th section of the act of 1819, by which a partial distribution of the assets, and without a final settlement, was held to be available under the plea, as an administration *pro tanto*, limiting the effect of the recovery, being inconsistent with this opinion, are consequently deemed erroneous.

IV. Of the remaining questions, the most important relates to certain slaves which had been conveyed in 1814, to a trustee for the sole use and benefit of Mrs. K. Thompson, the wife of L. Thompson, and which having been held in possession by the trustee until his death in 1825, were from that time possessed and controlled by Mrs. Thompson, claiming under the deed, and living with her husband until his death in March 1835, and were afterwards so held by her until her own death, about the first of February, 1837. Before the end of that month, Richardson was appointed administrator of the estates of L. Thompon, and also of K. Thompson.

VOL. VIII.        12

*Marginal notes:*

COMMONWEALTH
*vs*
RICHARDSON
*et al.*

The statute of 1819 did not intend to split up the remedy of the creditor, but to turn him from the executor to the distributee, when the suit is not brought within five years after settlement, as required by that act.

COMMONWEALTH
*vs*
RICHARDSON
*et al.*

He made his return of sales of the personalty, and hires of the slaves, in the double character of administrator of each of the decedents, and before the end of the second year, 1838, made his settlement in the same way, being charged and credited as administrator of L. and K. Thompson, without discrimination. The slaves themselves were not included (except a small sum for hires,) in any return or settlement. But, in November, 1837, about nine months after the grant of administration, Richardson, as administrator of K. Thompson, united in a petition with her heirs, (the children of L. and K. Thompson,) praying for the sale of the slaves as a part of her estate descended to them from their mother. A sale was decreed and made, for the sum of about $2,200, which Richardson was directed to collect and hold subject to the order of the Court of equity; and the fund was enjoined in his hands, under a bill filed by the relator in 1841, praying for its appropriation to the satisfaction of the claim against L. Thompson, which is the basis of the present proceeding. And it was not until 1843, that the action at law upon this claim was commenced against the administrator of L. Thompson. The concurrence of Richardson in the petition, and claim of the heirs of Mrs. Thompson, is the only act on his part, showing in what character he himself claimed and held the slaves. And unless he was bound to hold them as assets of the estate of L. Thompson, this concurrence must, in the absence of all other testimony, be regarded not only as competent, but decisive proof of the character in which he did hold them. It is contended on the part of the plaintiff, that as the deed of trust was never recorded, and as the possession of the slaves had continued in L. Thompson for more than five years before his death, they were, by operation of the statute of frauds. (1 *Stat. Law*, 739,) liable for his debts, and as far as creditors are concerned, his property, and that his administrator having had them in possession after his death, the law determines them to be assets in his hands for the payment of his debts, and makes him responsible for them to his creditors; and that the failure to appropriate them for that purpose, in

the due course of administration, is itself a *devastavit* which authorizes a recovery in this action to the full extent of the relator's demand. It is under this view of the law, and perhaps under the idea that the principles here stated will be more strictly applied in the legal than in the equitable *forum*, that he has abandoned or suspended his attempt to reach this very fund in the Court of equity which has possession of it, and seeks to convict the administrator of a *devastavit* for having placed it there. In the case of *Hart* vs *Thompson's heirs*, (3 *B. Monroe*, 489,) the Court in speaking of the attempt of Hart to subject these slaves to his demand against L. Thompson, say in reference to this same deed of trust, that as to his demand, it matters not whether the deed was recorded or not. "He was well apprised of its existence, its character and object, and will not be allowed, as complainant, to defeat its operation and purpose." If the legal principles involved in the proposition now under consideration, can be affected by the peculiar circumstances of the case, a Court of law might perhaps come to a similar conclusion in this case. The evidence tends to show that Thompson never controlled or claimed possession of the slaves, but acquiesced in the claim of his wife; that her control of them, and her claim of separate property was notorious; that the title, and even the possesion, was not considered as being in him; that no one was deluded or deceived into giving him credit on the faith of this property, but that during the entire period when the possession was in the condition referred to, he was regarded as being without credit or property; and that while the relator and his intestate were, from 1817, when this claim was due, resorting to various desperate remedies for its enforcement, they never resorted to the creditor's right of subjecting these slaves, upon the alledged possession of Thompson, under or against this unrecorded deed. If circumstances such as these can affect the questions, whether in view of the statute of frauds, the possession should be regarded as being or remaining with Thompson, so as to make the deed of trust fraudulent as to creditors, and as to them, to place the title in him, it

COMMONWEALTH
*vs*
RICHARDSON
*et al.*

would be at least doubtful whether the case should be considered as coming within the objects and operation of the statute. But even if it does, and if the statute placed the title in Thompson so far as his creditors were concerned, it is still a question if such title passed by law to his administrator so as to make him liable for a *devastavit* for not asserting and maintaining for the benefit of this creditor, a title which the creditor himself had so long neglected to make available, and which the administrator might well suppose he had waived.

Omitting all question as to the effect of any or all of these circumstances peculiar to the case, and conceding that the statute operating upon the possession placed the title in Thompson, for the benefit of his creditors without any right or claim on his part, and against the deed under which the possession was held, we shall confine ourselves to the enquiry whether this is a title which the law cast upon the administrator of Thompson as assets, binding him to assert and maintain it, and pronouncing him guilty of a *devastavit* for his failure to do so.

The administrator of husband, and then of the wife, united with the heirs of the wife in a petition for a sale and division of slaves. The wife had claimed them, & the husband had never asserted any claim of title or possession. Held that the administrator of the husband was not liable for a *devastavit* for not asserting title to property to which the husband had never set up any claim, though held by the wife by an unrecorded deed, the slaves were not assets, however they might have been liable at the instance of creditors of the husband,

Upon this question, as arising under the clause of the statute of frauds, which is applicable to the present case, we are not aware of any direct authority. But the analogies deducible from the decisions with reference to other parts of the statute, which declare the title to be in the party as to his creditors, &c., lead to the conclusion that this title does not, as a matter of course, pass to the administrator. With regard to sales and conveyances made to defraud creditors, which the statute declares to be void as to creditors, the doctrine is well established, that although as to creditors the title is adjudged to remain in the grantor, this reservation in favor of creditors is not a title which in the case of real estate can be transmitted by devise, or pass by descent, and that in case of personalty, the executor or administrator of the grantor does not take, and is not chargeable with it as a mere title. But that if the possession has passed, the creditor's remedy is against the grantee or the thing granted; and that if it be a chattel, the fraudulent vendee, whether he took the possession be-

fore or after the death of the vendor, may be treated by the creditor as as an executor *de son tort*, and is liable as such: *Ralls* vs *Graham*, (4 *Monroe*, 122–3; 2 *Sanders*, 137, *a. n.* 2;) *Harrison* vs *Campbell*, (6 *Dana*, 267;) *Warner* vs *Hall*, (6 *Dana*, 454;) *Stephens' adm'r.* vs *Barnett*, (7 *Dana*, 262, *and seq.*;) *Bethel* vs *Stanhope*, (1 *Croke's Rep.* 810.)

It is true that in some of the cases, it is said that the administrator is estopped by the sale or deed of his intestate. But if this be so, it is because the statute declares the sale, &c., to be void as against the creditors only, and it proves that the administrator is not clothed with the rights of the creditor, nor with that title which the law had reserved to the intestate for the benefit of his creditors, but with those rights only which the intestate himself might assert. If the administrator represented the creditors in regard to the thing fraudulently sold by his intestate, or could act in virtue of any supposed relation to them, then as they are not estopped by the fraudulent sale, he should not be estopped from the remedy by which their rights might be effectuated; and if, as is well settled, the title declared to be in the intestate, notwithstanding his fraudulent transfer, does not pass to his administrator for the benefit of the creditors, for whom it was reserved by the statute, we do not perceive on what ground the title declared to be in him against the terms of the loan or trust under which he has had the possession, and on account of the assumed fraud therein, can pass to his administrator.

As the intestate himself, holding the possession by loan or sufferance, and claiming no right in himself, could neither resist a demand of the possession by the title holder, nor recover it from him when taken, how could the administrator representing him and invested only with his rights alone, make out a better claim? The possession conceding it to have been in Lawrence Thompson, was never adverse to the deed of trust, or to the right of his wife or of the trustee under it. As against the trustee or his representative, he acquired no title by his possession. And when upon his death the possession remained with his widow, where it should right-

COMMONWEALTH
*vs*
RICHARDSON
*et al.*

An adm'r. is not clothed with the rights of the creditors of his intestate, so far as to be authorized to assail a conveyance fraudulently made by his intestate to a third person, and assert title to property conveyed, but only with such rights as his intestate might assert. Therefore where —The wife held slaves by an unrecorded deed of gift, the husband never asserting any claim, tho' husband and wife die, the administrator of the husband has no right to assert title to the slaves.

fully have been, under the deed, we are at a loss to imagine any ground upon which his administrator, had one been then appointed, could have recovered it from her. He would have been no creditor to rely upon the statute of frauds, and he could not have made out a title by exhibiting the debt due to the relator, even if it had been then known to him. On the other hand, the title under the deed sustained by long possession, and by the implied acknowledgment of his intestate, must have prevailed against him. Then if he had known the facts, the absence both of title and of adverse possession in Thompson, the actual right of the wife or her trustee, and in addition to this the failure of this creditor for ten years, to assert the liability of these slaves to his demand, would he not have been justified in acquiescing in Mrs. Thompson's claim and possession without even an attempt to disturb it? But administration not having been taken until near two years after the death of L. Thompson, during which the undisturbed possession remained with Mrs. Thompson till her death, we are satisfied that if different persons had then administered on the two estates, and if the administrator of Mrs. Thompson had taken possession of the slaves as of her estate, as he would naturally have done if he knew the facts, they could not have been recovered from him by the administrator of L. Thompson upon this title resumed for the benefit of creditors. And if he had taken the possession it could have been recovered from him either by the administrator of Mrs. Thompson or by the representative of the trustee, because the title which passed by the deed of trust had never been ousted by an adverse possession, except as to the creditors of L. Thompson, but was, to all other parties, confirmed by long possession under it; and because although an administrator is in some sense a trustee for creditors, he is trustee only for the administration of assets, and that trusteeship gives him no title which he would not otherwise have. We know of no class of assets held by the administrator for the benefit of creditors, but of which the surplus, after the payment of debts, would not belong to the distributees of the same intestate. Nor do we

know of any mode or rule by which the recovery of the administrator, if he could recover in right of creditors, could be limited to the value of their debts.

Richardson then having obtained administration of each estate at the same time, we are of opinion that in the absence of any act of his to the contrary, the law adjudges him to have been in possession as administrator of Mrs. Thompson, in whom the possession had remained till her death, as his own acts show that he intended and professed to be. And as Mrs. Thompson's title was good against him as administrator of her husband, the slaves were assets in his hands as her administrator. He never had them as administrator of L. Thompson, and never having had title to them in that character, he cannot be responsible for them in that character, to the creditors of L. Thompson. Upon his death, their remedy, if any, was against Mrs. Thompson, as executrix de son tort, and upon her death their remedy, if any, was against her administrator, upon whom her possession and her title devolved. In the case of Stephen's administrator vs Barnet, supra, Barnet was himself the fraudulent vendee of Towles, the debtor on whose estate he administered, and having had possession of the slaves which had been fraudulently sold, claiming them as his own, and having actually disposed of them, he was held liable for a devastavit as administrator. There could have been no question as to his personal liability, but only whether he should have been regarded as executor de son tort or as administrator. The distinction was in that case, merely formal. And the decision that Barnet might be held liable in either character, furnishes no authority for holding Richardson liable as administrator of L. Thompson, for assets properly held by him as administrator of K. Thompson. He cannot have committed a devastavit of the estate of L. Thompson, by disposing of the slaves in the character of administrator of K. Thompson, from whose estate he received them, and to whom they had belonged, subject only to the remedy of her husband's creditors. And even if Richardson had, by mistake, first taken the slaves as the estate of L. Thompson, and

COMMONWEALTH
*vs*
RICHARDSON
*et al.*

The slaves con-
veyed in *trust* to
the wife by an
unrecorded deed,
may have so long
remained with
the husband as
to have become
liable to the cre-
ditors of the hus-
band, yet the ad-
ministrator of
the husband,
cannot assert ti-
tle for the benefit
of creditors
where the intes-
tate never assert-
ed right but held
the possession
for the wife.

had afterwards, and especially before the deficiency of his personal estate was known or suspected, distributed them as of the estate of K. Thompson, we are not prepared to admit that this would have been a *devastavit* as to the estate of L. Thompson.

We conclude, therefore, with respect to the slaves, that although the possession during the coverture, may have placed the title in L. Thompson as to his creditors, yet if the possession was not adverse to the trust so as to have enabled him to resist the action of the trustee, this statutory title did not pass to his administrator by mere force of law, and that the alledged *devastavit* cannot be made out on that ground, so as to reach either the value of the slaves or their heirs in this action. The instructions on this subject were rather to the prejudice of the defendants than of the plaintiff.

Whether the plaintiff has now any remedy against the slaves or the price for which they sold, we need not enquire. And we need only add on this branch of the case, that the deed of trust by reason of its antiquity, of its having been kept by those claiming under it, and of its corroboration by long possession, was properly admitted in evidence without further proof of its execution. Indeed, the difficulty is to avoid the conclusion which, however, is not essential to the present case, that these circumstances, with the others before noticed, should give to it the same effect against the relator as if it had been recorded. The record of the petition for the sale of the slaves, though it would have afforded no protection if the administrator had been bound to hold them as of the estate of L. Thompson, unless as evidence under the fourth plea, of a complete distribution of that estate, and although under the views we have taken, it was not essential to the defence, was yet competent and relevant as showing in what character the administrator held and disposed of them, and was especially so in reference to the proceeding in chancery by which the proceeds of the sale were enjoined, and which was read in evidence by the plaintiff.

V. With respect to the small amount of personal property which came to the administrator's hands from

both estates, the law regards all the personalty in possession at the death of L. Thompson, except such articles as are specially reserved to the family by statute, as a part of his estate, to be accounted for as such. But whatever else was in possession of Mrs. Thompson at her death, whether arising from the land which was hers, or from the slaves, which were also hers, or from her own labor or management, is to be regarded as of her estate. And the question of *devastavit* in this case, is narrowed down to the enquiry whether the debts of L. Thompson, paid before the administrator had notice of the relator's demand, were equal to the value of his estate thus ascertained to have been in the hands of his administrator. If they were, then there was no *devastavit*, whether the administrator had settled or not. If there was a surplus, then the administrator was guilty of a *devastavit* to the extent of such surplus, unless before notice of the relator's demand, or any good reason to apprehend its existance, he had made entire distribution of the surplus, and had also, before suit against him, settled his accounts with the Court. This state of case, which might be available under the fourth plea, is not conclusively, if at all, made out as the record stands; and therefore, the error of the Court as to the effect of partial distribution, is a proper ground for a reversal of the judgment.

Wherefore, the judgment is reversed and the cause remanded for a new trial in conformity with this opinion.

*Turner* for plaintiff; *Caperton* for defendants.